NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

LEVI R., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, E.R., *Appellees.*

No. 1 CA-JV 22-0016
FILED 9-27-2022

Appeal from the Superior Court in Maricopa County
No. JS519937
The Honorable Lori Bustamante, Judge

**AFFIRMED**

COUNSEL

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Department of Child Safety*

**MEMORANDUM DECISION**

Vice Chief Judge David B. Gass delivered the decision of the court, in which
Presiding Judge Samuel A. Thumma and Judge Cynthia J. Bailey joined.

**G A S S**, Vice Chief Judge:

¶1            Levi R. (father) appeals the superior court's order terminating his parental rights. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2            Father is the biological parent of a now-five-year-old child. In 2017, the child's mother tried to place the child for adoption without father's consent. At that point, the Department of Child Safety (DCS) began the 2017 dependency. Father participated in visitation, parent-aide services, substance-abuse treatment, counseling, and family-reunification services. The superior court ultimately dismissed the 2017 dependency and awarded father sole legal decision-making.

¶3            After that, DCS continued receiving reports of violent incidents involving father. During one incident, father punched and tried to strangle his wife—who was not the child's mother—while the child was in the backseat of a moving vehicle. Later, when father and the child were living in Illinois, father's relatives locked themselves in a room and called police because father became violent, and they were scared he would hurt them. The same month, father took the then-two-year-old child with him to purchase drugs. The exchange turned sour, and father fled after being shot, leaving the child at the scene.

¶4            By March 2020, father and the child were living in Nevada. Father left the then-three-year-old child unattended to chase someone father claimed owed him money. The unattended child crossed a busy intersection, nearly getting hit by traffic. Father came back and took the child into a Burger King, only to again leave the child unattended so father could continue his chase. Police arrested father for child abuse and endangerment, and the Nevada Department of Family Services (Nevada DFS) took custody of the child.

¶5            Nevada DFS contacted DCS to transfer the case, believing Arizona had exclusive continuing jurisdiction. Meanwhile, Nevada DFS offered father eight virtual visits with the child. Father attended only two, both of which ended abruptly because father behaved inappropriately, accusing the child of lying and "grilling" the child about placement. At some point, the child returned to Arizona, and at the end of March 2020, father returned as well. DCS contacted father, and he initially agreed to participate in services but later refused.

¶6            Father was incarcerated for all but a few days of the 2020 dependency and termination actions. On April 5, 2020, while on release status, father threatened his sister with a knife and told DCS he would not engage in services. Five days later, police arrested and incarcerated father for domestic violence and a probation violation. At that point, DCS filed the 2020 dependency. The 2020 dependency is not before this court, and the record here regarding the 2020 dependency amounts to a few documents and references in the case worker's testimony. The record also includes documents from some of father's criminal cases.

¶7            Beginning early in the 2020 dependency, the child resisted visiting father. In April 2020, DCS's psychologist recommended father not have visits based on the child's "behaviors, emotional withdrawal and dysregulation, and history of instability and trauma." In July 2020, the court suspended father's visits. Father never asked DCS or the superior court to reinstate his visits. At the termination trial, DCS's psychologist testified the child's history of trauma would have made it "extremely difficult" for father to use visits while he was in custody to nurture a relationship with the child.

¶8            On June 27, 2020, father was released from jail and almost immediately broke into his wife's apartment. Police arrested father two days later. He remained incarcerated throughout the rest of the 2020 dependency and termination actions. DCS did not provide services to father during his incarceration. Father provided documents indicating he took courses on substance abuse, anger management, conflict resolution, behavioral change, and coping skills. Father, however, offered no further supporting evidence on those courses, and DCS did not consider them. The superior court recognized father's efforts, but also said father's participation did not necessarily mean he made the "behavioral changes needed for reunification." And as of the termination adjudication, the superior court found father still had "no insight into his violent temper and the [e]ffects his behaviors have had on" the child.

¶9            In May 2021, the child's guardian *ad litem* (GAL) petitioned to terminate father's parental rights based on the length-of-felony-sentence ground. *See* A.R.S. § 8-533.B.4. DCS did not seek to intervene—or ask to substitute in for the GAL—in the termination action. In July 2021, the GAL amended the termination petition to add the 15-month out-of-home placement ground. *See* A.R.S. § 8-533.B.8(c). The superior court held a consolidated dependency and termination trial. DCS handled the dependency portion, and the GAL handled the termination portion. After the contested trial, the superior court terminated father's parental rights on

the grounds alleged in a detailed January 2022 ruling. The record in this appeal does not include the superior court's ruling in the dependency action.

**¶10**        Father timely appealed. This court has jurisdiction under article VI, section 9, of the Arizona Constitution, and A.R.S. §§ 8-235.A, 12-120.21.A.1, and 12-2101.A.1.

## ANALYSIS

### I.        Father Waived Any Objection to DCS Participating in this Appeal.

**¶11**        The 2020 dependency is not before this court. In this termination action, DCS neither moved to substitute in for the GAL nor moved to intervene. Even so, DCS filed the only answering brief in this appeal. We asked father, the GAL, and DCS to brief DCS's ability to participate in this appeal under those circumstances.

**¶12**        DCS argues it has standing to appear in this appeal from a termination trial and argues father waived any challenge to its participation in the appeal. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 16 (App. 2014) (a parent who does not raise the issue in the superior court is precluded from challenging that finding on appeal). But having standing is not the same as being a party. *See Bechtel v. Rose In & For Maricopa Cnty.*, 150 Ariz. 68, 72 (1986) (standing is only one factor courts look at to determine if a party can intervene in an action). Father, in his supplemental brief, argues for the first time DCS did not have standing to file the answering brief on appeal because DCS was not a party to the severance petition. The superior court's under-advisement ruling does say DCS was a party "to these proceedings." Father did not seek any changes to that ruling in the superior court, and father did not raise the issue in his opening brief. In our discretion, we apply waiver here. *See Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 536, ¶ 9 (App. 2018) ("[T]he decision to find waiver is discretionary."). Father, thus, waived the issue of DCS's standing to file an answering brief on appeal.[1]

---

[1] To be sure, the better practice is for DCS to formally join as a party to avoid all doubt. Alternatives include moving to substitute in as a petitioner or seeking leave to intervene.

**II.      The Superior Court Need Not Consider a Permanent Guardianship When Terminating a Parent's Rights Based on a 15-Months' Time in Care Ground.**

**¶13**      Father argues the superior court "should [have] consider[ed] the availability of permanent guardianship" for the 15-months' time in care ground because he was incarcerated. *See Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 477, ¶ 27 (2022). This court reviews *de novo* "legal issues requiring the interpretation and application of § 8-533." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 580, ¶ 10 (2021) (quoting *Ariz. Dep't of Econ. Sec. v. Rocky J.*, 234 Ariz. 437, 440, ¶ 12 (App. 2014)).

**¶14**      In *Timothy B.*, where a specified family member was willing to serve as a permanent guardian, the Arizona Supreme Court said the normal-home consideration in length-of-felony-sentence cases means the court "should consider the availability of a permanent guardian to provide a normal home life [during the incarceration period] if another parent is unavailable." *Timothy B.*, 252 Ariz. at 477, ¶ 27. The Arizona Supreme Court issued its *Timothy B.* opinion after the termination order here, which did not address a permanent guardianship option for either the length-of-incarceration ground or the 15-months' time in care ground.

**¶15**      The plain language of the 15-month out-of-home placement ground does not require a *Timothy B.* inquiry. This court first looks "to the statute's plain language as the best indicator of [legislative] intent[,]" and if the language is clear and unambiguous, this court "must give effect to that language without employing other rules of statutory construction." *Parsons v. Ariz. Dep't of Health Servs.*, 242 Ariz. 320, 323, ¶ 11 (App. 2017). The out-of-home placement ground only requires: (1) the child was in court-ordered placement for at least fifteen months; (2) DCS made a diligent effort to provide appropriate reunification services; (3) father was unable to remedy the circumstance causing the child to be in court-ordered out-of-home care; and (4) a substantial likelihood father would not be capable of exercising proper and effective parental care and control in the near future. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17, ¶ 25 (App. 2019) (citations omitted); *see also* A.R.S. § 8-533.B.8(c). Those elements do not require the "normal home" analysis applicable to the lengthy-of-felony-sentence ground. *Compare* A.R.S. § 8-533.B.8(c) *with* A.R.S. § 8-533.B.4.

**¶16**      Because we affirm without regard to the length-of-incarceration ground, we need not further address *Timothy B.*

**III.     DCS Made Diligent Efforts to Provide Appropriate Reunification Services.**

**¶17**     Father argues the superior court erred in finding DCS made diligent efforts to preserve the family relationship.

**¶18**     "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 11 (2000)). Still, "parental rights are not absolute." *Kent K.*, 210 Ariz. at 284, ¶ 24. "To justify termination of the parent-child relationship, the [superior] court must find, by clear and convincing evidence, at least one of the statutory grounds set out in [§] 8-533, and also that termination is in the" child's best interests by a preponderance of the evidence. *Michael J.*, 196 Ariz. at 249, ¶ 12.

**¶19**     This court views the evidence together with any reasonable inferences in the light most favorable to affirming the superior court's decision. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13 (App. 2002). This court reviews the superior court's termination decision for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). But this court reviews *de novo* "legal issues requiring the interpretation and application of § 8-533." *Jessie D.*, 251 Ariz. at 580, ¶ 10 (quoting *Ariz. Dep't of Econ. Sec. v. Rocky J.*, 234 Ariz. 437, 440, ¶ 12 (App. 2014)).

**¶20**     DCS must make diligent efforts to provide appropriate reunification services before terminating parental rights for 15-months' time in care. A.R.S. § 8-533.B.8(c). What constitutes a diligent effort requires a case-by-case analysis. *Donald W.*, 247 Ariz. at 23, ¶ 49. To establish diligent efforts, DCS "must identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances *as they arise throughout the time-in-care period*, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* (emphasis in original).

**¶21**     In making diligent efforts, DCS also must provide a parent "with the time and opportunity to participate in programs designed to help [him] become an effective parent." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 14 (App. 2011). DCS, however, need not "provide every conceivable service or [] ensure that a parent participates in each service it

offers." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). For instance, DCS need not provide services if those services will endanger the child or have no reasonable prospect of success. *Jessie D.*, 251 Ariz. at 582, ¶ 21; *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

**¶22**         DCS argues father waived this issue by failing to raise it before the superior court. This court has held a parent may waive an element of DCS's burden of proof—such as the diligent-efforts requirement—if the parent fails to raise it adequately. *Shawanee S.*, 234 Ariz. at 177–79, ¶¶ 10–18. Even so, the *Shawanee* court identified how a parent may adequately raise an issue before the superior court, including by disputing diligence "at a termination hearing." *Id.* at 178, ¶ 14. Here, father brought out the lack of services during cross- and direct-examinations at the termination hearings. Father's closing arguments focused extensively on the issue. Accordingly, father at least minimally raised the issue and did not waive it.

**¶23**         In 2020, father initially was willing to participate in services. The Nevada DFS scheduled eight virtual visits for father in Nevada, but he attended only two. During an April 7, 2020 phone call with DCS, father "refused to meet with DCS and refused to discuss any services." The superior court suspended father's visits in July. The superior court suspended father's visits, in part, because father behaved inappropriately during the two Nevada visits—including accusing the child of lying and "grilling" the child about the placement family. The other reason was a DCS psychologist concluded having the child visit with father could cause the child "further disruption and emotional/psychological harm." The superior court has discretion to restrict visits if they would endanger the child. *Michael M. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 198, 201, ¶ 11 (App. 2002).

**¶24**         DCS did not fail to make reasonable or diligent efforts to provide services to father after that. This case originated in Nevada in March 2020. Father returned to Arizona toward the end of March 2020 and was arrested and incarcerated on April 10, 2020. He was released on June 27, 2020, and arrested again two days later. For the exceedingly brief time periods while father was out of custody in Arizona, DCS understandably provided father no services. For the remaining time periods, while father was incarcerated, DCS also provided no services.

**¶25**         Father's opening brief faults DCS and the superior court for not allowing visits while he was incarcerated. Father's argument focuses on

relevant courses he completed while incarcerated. But father points to no time when the visits would not pose any risk to the child. *See id.* The superior court recognized father's participation in the programs but also found father's participation did not necessarily mean he had made the "behavioral changes needed for reunification." And as late as the termination trial, the superior court found father lacked "insight into his violent temper and the [e]ffects his behaviors have had on" the child. Father's participation in those programs, therefore, would not have resulted in an earlier restoration of his visits.

¶26     Because the superior court did not err in terminating father's rights based on 15-months' time in care, we need not address his challenges regarding the length-of-incarceration ground. In addition, father has not challenged the superior court's best interests findings, which are fully supported by the record.

**CONCLUSION**

¶27     We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA